UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| N.G. (a minor, by and through his parent and guardian ad litem, Jessica Green),<br><br>Plaintiff,<br><br>v.<br><br>TEHACHAPI UNIFIED SCHOOL DISTRICT,<br><br>Defendant. | 1:15-cv-01740-LJO-JLT<br><br>**MEMORANDUM DECISION AND ORDER AFFIRMING ADMINISTRATIVE DECISION** |

## I. <u>INTRODUCTION</u>

Plaintiff N.G ("Plaintiff" or "Student"), a minor, brings this action through his parent Jessica Green ("Parent") against Defendant Tehachapi Unified School District ("Defendant" or "District") under the Individuals with Disabilities Education Act ("IDEA" or the "Act"). Plaintiff appeals certain findings in an adverse administrative decision, arguing that the administrative law judge ("ALJ") erred in concluding that the District conducted a timely and appropriate functional behavioral assessment and that Plaintiff therefore was not denied a free and appropriate public education ("FAPE") during the 2013-2014 and 2014-2015 school years. Defendant opposes and asks the Court to affirm the administrative decision. For the reasons explained below, the administrative decision is AFFIRMED.

## II. <u>STATUTORY FRAMEWORK</u>

IDEA provides federal funds to help state and local agencies educate children with disabilities while conditioning the funds on compliance with specific goals and procedures, primarily the obligation to provide a free appropriate public education ("FAPE"). 20 U.S.C. § 1412; *Board of Educ. of Hendrik Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 179-80 (1982) (describing the genesis and primary provisions of IDEA). Among the procedures mandated by IDEA is the development of a written individualized education program ("IEP") for each child with a disability. 20 U.S.C. § 1401. The IEP is crafted to meet the unique needs of each child with a disability by a team that includes a representative of the local educational agency, the child's teacher and parents, and, when appropriate, the child. 20 U.S.C § 1414(a)(5).

Violations of IDEA may arise in two situations. First, a school district, in creating and implementing the IEP, can run afoul of the Act's procedural requirements. *Rowley*, 458 U.S. at 176. Second, a school district can be liable for a substantive violation by drafting an IEP that is not reasonably calculated to enable the child to receive educational benefits. *Id.* The Supreme Court recently considered the content of the FAPE standard in *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017). The *Endrew F.* standard, which provides that an IEP must be reasonably calculated to enable "progress appropriate in light of the child's circumstances," *id.*, clarifies the older *Rowley* standard that an IEP must be "reasonably calculated to enable the child to receive educational benefits," 458 U.S. at 206-07. The Supreme Court explained that, for a student "who is not fully integrated in the regular classroom and not able to achieve on grade level," an "IEP need not aim for grade-level advancement" but should be "appropriately ambitious in light of [the student's] circumstances" such that the student has "the chance to meet challenging objectives." *Id.* at *11.

Under IDEA, parents have the opportunity to present complaints. 20 U.S.C. § 1415(b)(1)(E). After making their complaint, the parent is entitled to "an impartial due process hearing . . . conducted by the State educational agency or by the local educational agency or an intermediate educational unit,

as determined by State law or by the State educational agency," 20 U.S.C. § 1415(b)(2), and if either party is dissatisfied with the state educational agency's review, they may bring a civil action in state or federal court, 20 U.S.C. § 1415(i)(2).

In an action appealing the administrative determination in an IDEA case, the reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

## III. FEDERAL AND STATE REGULATIONS

Prior to July 1, 2014, California state education regulations required a Functional Behavioral Analysis ("FBA") or Functional Analysis Assessment ("FAA")[1] be undertaken when a student developed a "serious behavior problem," which was defined as behaviors "which are self-injurious, assaultive, or cause serious property damage and other severe behavior problems that are pervasive and maladaptive for which instructional/behavioral approaches specified in the student's IEP are found to be ineffective." 5 Cal. Code Reg. § 3001(g) & (ab), repealed effective July 1, 2014.

Those regulations were repealed effective July 1, 2014, leaving in place the federal regulation and parallel state regulation which provide that in the case of a child "whose behavior impedes the child's learning or that of others," the IEP team must, "consider the use of positive behavior interventions and supports, and other strategies, to address that behavior." 34 C.F.R. § 300.324(a)(2)(i); Cal Educ. Code § 56341.1(b)(1).

## IV. FACTUAL BACKGROUND

At the time of the administrative hearing, Student was a seven-year-old boy who was eligible for special education services pursuant to IDEA under the categories of autistic-like behavior and speech

---

[1] "An FBA is a systematic process of identifying the purpose—and more specifically the function—of problem behaviors by investigating the preexisting environmental factors that have served the purpose of these behaviors." Perry A. Zirkel, *Case Law for Functional Behavior Assessments and Behavior Intervention Plans: An Empirical Analysis*, 35 Seattle U. L. Rev. 175 (2011). For the purposes of this case, there is no difference between an FBA and an FAA.

and language impairment.[2] (Administrative Record ("AR") 734.)

A.    **2012-2013 School Year**

Student attended Southern Kern County Unified School District ("Kern County District") during the 2012-2013 school year. (AR 734.) Kern County District developed an IEP for special education for Student based on autistic-like behavior and speech and language impairment on May 21, 2012. (AR 245-84.) Kern County District's IEP included a behavior support plan, which was completed after Student displayed aggressive behavior, including "slapping, pushing and pulling hair." (AR 242-44; AR 550-52.) On May 14, 2013, Kern County District reviewed and updated Student's IEP. (AR 297-312.) Although the IEP team noted that at that time Student was "maintain[ing] fairly consistent . . . compliant behavior" (AR 299; AR 303), the IEP team decided to retain two behavioral goals in the new IEP due to "possible behavior regression resulting from transitioning to a new class and participating in a longer school day," (AR 299). Parent agreed to that IEP. (AR 312.)

B.    **2013-2014 School Year: Kindergarten**

Student enrolled in the District on August 14, 2013, and was placed in Richard Stanley's kindergarten classroom for students with mild/moderate special needs. (AR 494-95.) On September 12, 2013, the IEP team convened to discuss Student's placement and the goals and objectives in the IEP. (AR 501.)

For some portion of the school year, Student was accompanied in the classroom by a private aide. The testimony suggests that private aides accompanied him for one or two days per week from August to November of 2013. (AR 515; AR 736-37; AR 2362-70.) Witnesses testified that the aides observed Student, but did not assist with academic work. (AR 896; AR 993-94; AR 1315-16.)

Mr. Stanley was responsible for developing curriculum for Student, and worked directly with Student on his IEP goals and objectives. (AR 1163:13-1169:20.) According to Mr. Stanley, students in

---

[2] The question of whether Student's autism diagnosis continues to be appropriate was discussed at the administrative hearing, but his eligibility criteria was not an issue in the administrative hearing and is not an issue on appeal. (AR 743 & n.9.)

the class could be divided into three levels of academic ability, with Student at the high end of the middle group. (AR 1172:9-1173:13.) Student exhibited some behavioral issues in kindergarten, such as refusing to do classwork and becoming upset after being given instructions, but could be successfully redirected. (AR 1204:19-24.) Mr. Stanley testified that Student did not engage in any violent behavior during the school year. (AR 1225:21.) He further testified that Student's behavior improved toward the end of the school year. (AR 1204:25-1205:4.) Mr. Stanley did not believe Student required more behavioral support than what was provided in the classroom. (AR 1243:12-1244:17.)

Paraprofessionals Cynthia Isbell and Melinda Anspach were also assigned to Mr. Stanley's kindergarten classroom during the 2013-2014 school year and observed Student's engaging in behaviors such as elopement out of the classroom, avoidance of work, and defiance of adult instructions. (AR 899:11-25; AR 1001:19-22.) Ms. Anspach observed that Student was successfully redirected on most occasions. (AR 1001:24-1002:2; AR 1027:19-128:3.) Ms. Isbell indicated that she observed frustration, aggressiveness, and defiance from Student that escalated toward the end of the school year. (AR 899:11-25.)

Student missed four days of school during his kindergarten year. (AR 657.) His record does not indicate that the District took any disciplinary action against him during kindergarten. (AR 658.)

On May 12, 2014, the District held its annual meeting to review Student's IEP. (AR 502-13.) Mr. Stanley and Parent both attended the meeting. (AR 511.) Student had met several of his IEP goals for the school year, and the IEP team set new goals in academic subjects. (AR 503.) The team did not feel that Student required behavior goals or a behavior intervention plan ("BIP"), but did "develop behavior accommodations that included verbal encouragement, on-task reminders, warning Student of transitions and environmental changes . . . and increased verbal response time." (AR 507; AR 736; AR 1225-26.) The District offered continued placement in a first grade special education classroom for the following school year. (AR 513.) Parent consented and agreed to implement the May 12, 2014 IEP in its entirety. (*Id.*)

C. **2014-2015 School Year: First Grade**

On August 13, 2014, Student began the school year in Nancy Piercy's first grade special education class. (AR 737.) Student was not accompanied by a private aide, and the District did not assign Student a paraprofessional aide. (*Id.*) On August 24, 2014, student experienced a grand mal epileptic seizure outside of school. (AR 2233-34.) He was hospitalized for three days, and was absent from school for illness from August 25, 2014 through September 19, 2014. (AR 660; AR 2234-35.) In preparation for Student's return to the classroom, the IEP review team met on September 8, 2014 to discuss Student's medical needs, including the need for adults interacting with Student to be trained to administer Diastat[3], and Student's doctor's recommendation that Student be accompanied by a one-to-one aide at all times because of the potential for seizures. (AR 737.)

Student returned to school on September 22, 2014. (AR 660; AR 2235.) After his return, Student's behavior deteriorated and he became increasingly physically aggressive. (AR 926-29; AR 1028-29.) Holly Reddig, a paraprofessional aide assigned full-time to Student starting in October 2014, testified that he spent approximately 70% of the school day outside the classroom on breaks and that he refused to do classroom work. (AR 926-29.)

On October 17, 2014, the IEP team met to discuss Student's medical and behavioral needs, including his seizures and his increasingly physically aggressive behavior. (AR 514-19.) Parent indicated that Student's increasingly aggressive behavior coincided with his seizure disorder diagnosis. (AR 515.) The team discussed strategies for addressing Student's behavior, and the District offered to assess Student to determine whether he needed a Special Circumstance Instructional Assistance ("SCIA") aide. (AR 517.) Parent agreed and signed an assessment plan for a SCIA aide. (*Id.*)

After the meeting, Student was suspended from school following an incident in which he was violent and aggressive to a teacher and other students. (AR 521.) The District held a manifestation

---

[3] Diastat is a diazepam rectal gel which is used to control seizures. *Diastat AcuDial*, http://www.diastat.com/ (last accessed April 4, 2017).

determination meeting[4] following the incident on October 29, 2014. (AR 520-28.) The team agreed to a plan to address Student's new behaviors and medical diagnosis, including the completion of two FBAs to assess Student's elopements and aggression. (AR 527.) Parent consented to the plan in writing. (AR 528.)

Following the manifestation determination meeting, Student was absent from school for the remainder of the semester for illness or home hospital. (AR 659-60.) Parent signed an administrative amendment to the IEP signed by on December 8, 2014 indicating that Student had been placed on home hospital per his physician's instructions. (AR 529.) The parties did not offer any testimony regarding what academic instruction, if any, was provided during this period. The District did not complete the FBAs agreed to at the October 29, 2014 meeting while Student was on home hospital.

On January 6, 2015, Student returned to school. (AR 659.) Student was suspended for behavior issues on January 23, 2015. (*Id.*) School psychologist Dawn Roach asked Parent to sign a waiver extending the time to complete the FBAs, explaining that the District had not yet completed the FBAs due to Student's absence from school and requesting a further delay due to the fact that his behaviors appeared to have subsided. (AR 555; AR 1625-26.) School psychologist Sharon Owen testified that the delay was appropriate because it gave Student an opportunity to re-adjust to the school environment and to the changes in his medication before assessing him. (AR 1471-73.) Parent signed a waiver extending the time to complete the FBAs on January 26, 2015. (AR 555.) The waiver provided for a four week extension to monitor Student's behavior before continuing with the assessment, but noted that the FBA "would be started" if Student's behavior worsened. (*Id.*)

Student's behavior continued to deteriorate throughout February 2015. According to his one-to-one aide, he had many behavioral incidents, including loud outbursts, temper tantrums, anger, and

---

[4] The purpose of a manifestation determination review is to decide whether the conduct at issue was a manifestation of the student's disability. 20 U.S.C. § 1415(k)(1)(E); 34 C.F.R. § 300.536(a)(1). As provided in § 300.530(e), a manifestation determination is only required for disciplinary removals that constitute a change of placement under § 300.536. A change of placement occurs if the student is removed from school for more than 10 consecutive days or the student has been subjected to a series of removals that constitute a pattern. *Id.*

hitting. (AR 1052.) His elopements were more frequent to the point where Ms. Piercy was unable to instruct him consistently. (AR 1049.) He was absent from school three days in February due to illness. (AR 659.)

Ms. Roach completed the two FBAs on February 6 and March 6, 2015. (AR 613-17; AR 713-21; AR 546-47; AR 741-42.) In her February 6, 2015 report related to Student's aggressive behaviors, Ms. Roach described Student's recent problematic behavior, noted that Student had no behavior goals as of his most recent IEP, and recommended three behavior goals as well as the development of a BIP. (AR 613; AR 617.) In her March 6, 2015 report related to Student's elopement behavior, Ms. Roach summarized Student's history of elopement, and recommended that the IEP team develop a BIP. (AR 713-21.)

The District held an IEP team meeting to discuss the results of the assessments on March 12, 2015. (AR 536-49.) The District proposed placing Student in a separate classroom without any other students for four to six weeks to implement the recommendations from the FBAs. (AR 547.) Parent agreed to implement the program on a temporary basis. (AR 549.) Student was absent from school March 11 through March 17, 2015. (AR 659.) Student attended a separate classroom for three days in March 2015. During those three days, he exhibited aggressive behavior, including hitting and kicking. (AR 661.) On the third day, he stabbed a teacher with a pencil. (AR 661; AR 955-56.) The District suspended Student from school on March 23 and March 24, 2015. (AR 659.) Parent did not allow Student to return to school for the remainder of the school year out of concern for Student's safety. (AR 2289; AR 659.)

Of the 145 days Student was enrolled in the District in the 2014-2015 school year, Student was present for eighty-six days. (AR 659.) He was absent for illness seventeen days, on home hospital for twenty-two days, absent on independent study for nineteen days, and suspended for nine days. (*Id.*)

## V. <u>PROCEDURAL HISTORY</u>

Student, through Parent, filed a due process hearing request against the District with the

California Office of Administrative Hearings ("OAH") on March 30, 2015, alleging that Student was denied a FAPE on two grounds: 1) the District failed to conduct a timely and appropriate behavioral assessment, and 2) the District failed to include autism-specific therapies in the classroom, failed to provide a dedicated one-to-one behavioral aide and failed to provide structured teaching methods to meet Student's unique needs. (OAH Case No. 2015040167.) District filed a complaint against Parent on Student's behalf on May 22, 2015, alleging that the District's speech and language assessment conducted in February and March 2015 complied with IDEA such that Student was not entitled to an independent educational evaluation. (OAH Case No. 2015050907.) OAH consolidated the two matters on June 9, 2015. (AR 731.)

The ALJ heard this matter in Tehachapi, California on July 1, 2, 7, 8, and 9, 2015 and telephonically in Van Nuys, California on July 10, 2015. After the hearing, the parties submitted closing arguments in writing. The record was closed and the matter submitted on July 27, 2015. On August 20, 2015, the ALJ issued a decision in the matter of *Student v. Tehachapi Unified School District*, OAH Case Nos. 2015040167, 2015050907 ("Administrative Decision"). In the Administrative Decision, the ALJ denied Student's claim for relief as to both issues, finding that Student was not denied a FAPE during the 2013-2014 and 2014-2015 school years. (AR 733.) The ALJ also denied the District's claim for relief, finding that the District failed to demonstrate that its speech and language assessments were appropriate. (AR 733-34.)

Student filed a complaint in this Court on November 18, 2015 seeking relief and the recovery of attorneys' fees under 20 U.S.C. § 1415(i)(3) and California Education Code § 56507. (ECF No. 1.) Student filed an opening appeal brief on December 19, 2016, appealing only the first issue in the Administrative Decision: whether the District failed to conduct a timely and appropriate behavioral assessment. (ECF No. 37.) District filed its opposition on January 13, 2017. (ECF No. 38.) Student replied on January 30, 2017. (ECF No. 39.) The Court has jurisdiction to hear this appeal under 20 U.S.C. §§ 1415(i)(2) and (3), and Student has exhausted his administrative remedies.

# VI. <u>STANDARD OF DECISION</u>

"When a party challenges the outcome of an IDEA due process hearing, the reviewing court receives the administrative record, hears any additional evidence, and 'bas[es] its decision on the preponderance of the evidence.'" *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007) (quoting 20 U.S.C. § 1415(i)(2)(B)). Based on this standard, "complete de novo review of the administrative proceeding is inappropriate." *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (9th Cir. 2007). As the party seeking relief in this Court, Student bears the burden of demonstrating that the ALJ's decision should be reversed. *Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994). In addition, the party challenging the administrative decision bears the burden of persuasion on each claim challenged. *Id.*

In review of an IDEA due process hearing, courts give "less deference than is conventional" in review of other agency actions. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993). "How *much* deference to give state educational agencies, however, is a matter for the discretion of the courts." *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987). The Court reviews *de novo* the question whether a school district's proposed IEP provided a FAPE under IDEA, but reviews the district court's findings of fact only for clear error. *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1118 (9th Cir. 2016). Mixed questions of law and fact are reviewed *de novo*, unless the question is primarily factual. *Gregory K.*, 811 F.2d at 1310.

"'[D]ue weight' must be given to the administrative decision below and [ ] courts must not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Van Duyn*, 502 F.3d at 817 (quoting *Rowley*, 458 U.S. at 206). "[T]he amount of deference afforded the hearing officer's findings increases where they are thorough and careful." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995). This Court gives deference to an ALJ's decision "when it 'evinces his [or her] careful, impartial consideration of all the evidence and

1  demonstrates his [or her] sensitivity to the complexity of the issues presented.'" *Cty. of San Diego v.*

2  *California Special Educ. Hrg. Off.*, 93 F.3d 1458, 1466 (9th Cir. 1996).

3  ### VII. ANALYSIS

4  Student argues that he was denied a FAPE from August 14, 2013 until March 30, 2015 because

5  the District failed to complete an appropriate FBA in accordance with state and federal laws and

6  regulations applicable during that period. Student further submits that in finding that he was not denied a

7  FAPE, the ALJ demonstrated bias against him in fact-finding and failed to apply the applicable law to

8  the facts. [5]  The District counters that Student did not meet his burden during the administrative

9  proceedings of demonstrating that his behavior should have triggered an FBA or that the delay in

10  providing an FBA denied him a FAPE.

11  The parties in this case did not supplement the administrative record with additional evidence.

12  (ECF No. 32.) The parties further stipulated that live testimony is not necessary in this case. (*Id.*)

13  Therefore, this appeal is suitable for decision on the administrative record without a hearing.

14  A.  **Kindergarten: 2013-2014 School Year**

15  During Student's kindergarten year, California law mandated that the District complete an FBA

16  or FAA for a child displaying "serious behavior problems." 5 Cal. Code Reg. § 3001(ab) & (g);

17  § 3052(b). Serious behavior problems are defined as behavior that is assaultive, self-injurious, conduct

18  giving rise to property damage or other severe behavior that is "pervasive and maladaptive" *and* "for

19  which instructional/behavioral approaches specified in the student's IEP are found to be ineffective."

20  *Id.*; *see also A.B. v. San Francisco Unified Sch. Dist.*, No. C07-4738PJH, 2008 WL 4773417, at *17

21  (N.D. Cal. Oct. 30, 2008) (interpreting 5 Cal. Code Reg. § 3001 and concluding that student's poor

22  _____

23  [5] Student also asserts that the ALJ's administrative findings should not be afforded deference because they were neither thorough nor careful and because her determinations of credibility were inconsistent and not supported by clear and convincing evidence. (ECF No. 37 at 2.) Student frames the question of deference to the ALJ's findings as a separate issue on

24  appeal. However, the Court does not view this question as a separate substantive ground for appeal, and will instead address each of Student's material objections to the ALJ's factual findings in the context of determining whether Student was denied a FAPE. As an initial matter, the Court notes that the ALJ heard six days of testimony and that her thirty-four page

25  Administrative Decision contains thorough and well supported factual findings and credibility determinations.

behavior was not sufficiently severe to require an FBA in third, fourth, or fifth grade where student's behavior improved during those years and was devoid of serious maladaptive or disruptive behavior).

Student contends that District denied Student a FAPE by failing to offer an FBA during the 2013-2014 school year. However, the Student has not proved by a preponderance of the evidence that he exhibited "serious behavior problems" triggering the need for an FBA during kindergarten.

### 1.    Reference to "Physical Aggression" in September 12, 2013 IEP

Student contends that his September 13, 2013 IEP lists "physical aggression" as an "area of need." (ECF No. 37 at 12 (citing AR 498).) According to Student, this description indicates that Student was aggressive at the time of his enrollment with the District and that this behavior should have triggered an FBA immediately at the beginning of Student's kindergarten year. (*Id.*)

Student's assertion mischaracterizes what the IEP says. Student's IEP, created on September 12, 2013, borrowed heavily the May 14, 2013 IEP created by the Kern County District IEP team at the end of the 2012-2013 school year. (*Compare* AR 498 *with* AR 299.) The May 14, 2013 IEP indicates that one of the goals from his *prior* May 2012 IEP was to "verbally express his anger or frustration instead of using physical aggression." (AR 299; AR 498.) However, the May 2013 IEP noted that at the time Student was "maintaining fairly consistent and compliant behavior" and that he was "maintaining compliant behavior with 1 or less verbal reminders." (AR 299.) The May 2013 IEP indicated that the team wanted to maintain Student's behavior goal in spite of Student's progress, "due to [Student's] possible behavior regression resulting from transitioning to a new class and participating in a longer school day." (*Id.*) Contrary to Student's assertion, the September 2013 IEP does not suggest that Student displayed aggressive behavior during the 2013-2014 kindergarten school year. Indeed, it suggests that prior to enrolling in the District, Student's had not displayed aggressive behavior during the 2012-2013 school year either. The language regarding "physical aggression" in Student's September 2013 IEP is not evidence that Student exhibited behavioral problems during the 2013-2014 kindergarten school year.

### 2.  **Retention of Private Aide in Classroom**

Student points to the fact that he was allowed to keep his privately funded aide with him in the classroom as evidence that his behavior was a "priority" for his IEP team during kindergarten. (ECF No. 37 at 12.) However, the record indicates that the IEP team concluded that the aide should remain in the classroom "until mom can get in to observe" and does not suggest that the private aide was kept in the classroom due to Student's negative behavior. (AR 501.) Indeed, the privately funded aide stopped coming to the classroom in November 2013 "due to [Student's] good progress." (AR 515.) Moreover, the fact that Student's behavior was a "priority" for his IEP team, as Plaintiff claims, does not demonstrate that Student exhibited behaviors rising to the level of a "serious behavior problem." *A.B.*, 2008 WL 4773417, at *17 ("Thus, even though it cannot be disputed that plaintiff continued to exhibit some maladaptive behaviors during the third through fifth grades . . ., the court is not persuaded that plaintiff has sufficiently cast doubt on the ALJ's conclusion that no FBAs were warranted based on the evidence presented.").

### 3.  **Testimony of Richard Stanley**

Student contends that the testimony of Student's kindergarten teacher, Richard Stanley, confirmed that Student had a serious behavior issue during the 2013-2014 school year. Mr. Stanley testified that Student became upset and would crawl under the table and refuse to do classwork. (AR 1204:1 – 1205:7.) However, Mr. Stanley testified that Student could usually be redirected, and none of the conduct that Mr. Stanley testified to was self-injurious, physically aggressive, or otherwise severe in nature. (AR 1204:25-1205:4; AR 1225:21; AR 1243:12-1244:17.) Serious behavior problems as defined by now-repealed subsections § 3001 included only those behaviors that were both severe – i.e. physically aggressive or maladaptive – *and* which could not be controlled by approaches specified in the student's IEP. Mr. Stanley's testimony indicates that Student did not display serious behavior problems.

Student also contends that Mr. Stanley testified that Student displayed "aggressive behaviors." (ECF No. 37 at 12.) This argument mischaracterizes Mr. Stanley's testimony. Plaintiff's counsel asked

Mr. Stanley whether he could see that Student's conduct *was described* as aggressive in the exhibit placed in front of him. (AR 1217: 21-24 (citing AR 365).) Mr. Stanley confirmed that is what the exhibit in front of him said, but denied that he wrote that description. (AR 1217:15-1218:6.) It is also apparent from the surrounding testimony that the description of Student's behavior as "aggressive" referred to a behavioral benchmark or goal written before Student enrolled in the District and not to behavior that was observed by Mr. Stanley.[6] (*See* AR 1211-14.) Mr. Stanley did not, at any point in his testimony, describe Student's behavior as aggressive. To the contrary, he testified that Student did not exhibit any violent behavior, that he could be redirected successfully when he would get upset or avoid class work, and that his behavior improved over the course of the school year. (AR 1204:25-1205:4; AR 1225:21; AR 1243:12-1244:17.) Mr. Stanley also indicated that he did not believe that Student needed more behavioral support than what was already provided for in Student's IEP. (AR 1243:12-1244:17.) Indeed, Mr. Stanley and the rest of the IEP team removed Student's behavioral goals at the IEP review meeting end of the 2013-2014 school year after concluding that they were no longer necessary. (AR 507; AR 736; AR 1225-26.)

Student also points to Mr. Stanley's testimony that Student was segregated in a special education classroom for no reason other than his behavior as evidence that the District should have conducted an FBA. (ECF No. 37 at 12.) However, the fact that student had behavioral issues does not trigger the California regulation providing for an FBA if those issues did not rise to the level of a "serious behavior

---

[6] Student's May 2012 and May 2013 IEPs from Kern County District each contain behavioral goals. Along with those broader goals, the team set out incremental goals assigned to future dates. Student's May 2012 IEP lists a social/emotional goal: that by May 2013, Student will "verbally ask for help or express his anger or frustration instead of using physical aggression in a social situation." (AR 283.) The IEP then sets out incremental goals for October 2012, December 2012, March 2013, and May 2013 to track Student's progress toward his goal. (*Id.*) The May 2013 IEP reiterates this goal, but notes that Student "is maintaining fairly consistent compliant behavior." (AR 299.) It again sets out incremental goals for the following year. Under the March 2014 goal, it states: "[Student's] behavior has been very inconsistent. He has had several cycles of noncompliant and sometimes aggressive behavior." (*Id.*) It is not clear why this description, clearly written prior to the May 2013 meeting date, is written under the goal for May 2014. (*Id.*) This description also conflicts with the contemporary assessment that Student was "maintaining fairly consistent and compliant behavior." (*Id.*) In any case, this description predates Student's enrollment in the District, and therefore is not evidence of his behavior during his 2013-2014 kindergarten school year. *See also* AR 1211:1-1214:4 (describing confusion with the document).

14

problem" as defined by the regulation. *Rodriguez v. San Mateo Union High Sch. Dist.*, 357 F. App'x 752, 753 (9th Cir. 2009) (not every behavioral problem "rise[s] to the level of severity necessary to trigger the need for a BIP"). The fact that Student was enrolled in a special day class due to behavior stemming from his autism diagnosis is not evidence of a serious behavioral problem triggering an FBA. *See W.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 150 (S.D.N.Y. 2006) ("It is the ability to make educational progress—not simply the fact of inappropriate behavior—that is the concern of the IDEA.").

### 4. **Other Testimony**

In his reply, Student asserts that the ALJ improperly disregarded testimony by the parent of one of Student's classmates[7] and two district aides who contradicted Mr. Stanley's testimony and testified that Student had serious behavioral issues in kindergarten. (ECF No. 39 at 4.) This is inaccurate. The classroom parent testified about an incident she witnessed during August 2014 – Student's first grade year. (AR 1851.) That testimony is not relevant to the question of whether Student displayed serious behavioral issues in kindergarten.

With respect to the testimony of the aides, Melinda Anspach actually indicated that Student did *not* have significant behavioral issues during his kindergarten year, contrary to Student's assertion. (*Compare* ECF No. 39 at 4 *with* AR 1001-02.) Cynthia Isbell testified that she had occasion to observe Student during his kindergarten year – albeit only intermittently. (AR 901-02.) She recalled that his behavior was worse towards the end of that school year. (AR 899:11-25.) The ALJ did not find her to be as credible as Mr. Stanley because she did not work with Student consistently during that year, and because she was not part of Student's IEP team and not aware of his educational goals. (AR 736.) The Court agrees with the ALJ's assessment. Ms. Isbell did not work with Student extensively or consistently during kindergarten; Mr. Stanley had a more thorough understanding of Student's behavior

_____

[7] Because the other parent is proceeding against the District separately on behalf of her child, who is also a special education student in the District, the Court will not identify the witness by name so as to protect the privacy and identity of that child. (*See* AR 738 n.4.)

1  and performance during kindergarten.[8] His testimony, which was corroborated by Ms. Anspach, that

2  Student did not display behavioral issues that could not be successfully redirected through behavioral

3  supports in the IEP was more credible.

4      The weight of the evidence in the administrative record indicates that Student did not display

5  serious behavioral problems in the 2013-2014 school year, nor did his behavior impede his learning or

6  that of others. (AR 734-37; AR 896-97; AR 925-26; AR 998; AR 1000-02; AR 1027-28; AR 1204-05;

7  AR 1223-26; AR 1319.) Indeed, the evidence indicates that Student met his behavior goals during the

8  school year such that the IEP review team felt comfortable removing his behavior goals at the May 12,

9  2014 IEP meeting. (AR 503; AR 508; AR 1225-26.) The Court finds that Student has not met his burden

10  of showing that District denied him a FAPE by failing to complete an FBA during the 2013-2014 school

11  year.

12  B.    **First Grade: 2014-2015 School Year**

13      Between Student's kindergarten and first grade years, California repealed the regulation

14  mandating that an FBA or FAA be administered when a student exhibits a "serious behavioral problem."

15  5 Cal. Code Reg. § 3001(a)(b), repealed effective July 1, 2014. The federal and parallel state regulations

16  that remain in place provide that in the case of a child "whose behavior impedes the child's learning or

17  that of others," the IEP team must, "consider the use of positive behavior interventions and supports, and

18  other strategies, to address that behavior." 34 C.F.R. § 300.324(a)(2)(i); Cal Educ. Code

19  § 56341.1(b)(1). Federal law does not specify how districts must address certain behavior. Rather, it

20  allows school districts to address behavior in a variety of ways through the IEP process.

21      Student contends that District denied Student a FAPE by failing to administer an FBA in a timely

22  fashion. However, the Student has not proved by a preponderance of the evidence that the District's

23

24  [8] Student also asserts that Mr. Stanley testified that Student made no progress during the year and that he was "unaware of N.G.'s academic levels, goals, curriculum, was not aware of N.G.'s IEP and was never told why N.G. was not in general education." (ECF No. 39 at 4.) To the contrary, Mr. Stanley testified that Student made significant progress during

25  kindergarten in meeting his academic and behavioral goals. (AR 1227.) Mr. Stanley also testified extensively as to Student's goals, curriculum, behavior, and performance. (AR 1205; AR 1221-27.)

response to Student's behavior was not in accordance with applicable law.

1. **Testimony of Classmate's Parent**

During the administrative hearing, the parent of one of Student's classmates testified that she observed Student's classroom in August 2014, the beginning of his first grade year, and noticed that Student spent time wandering around the classroom, hiding under a desk, and not completing his classwork. (AR 1861:7-12.) Student contends that this testimony is evidence that Student was engaging in behavior that should have triggered an FBA at the beginning of the 2014-2015 school year. The ALJ does not discuss this aspect of parent's testimony in the Administrative Decision, but does note that she gave minimal weight to other aspects of this parent's testimony because the parent was pursuing a separate claim against the District and appeared to be biased. (AR 738 n.4.) Student objects to the ALJ's determination that this testimony was entitled to minimal weight and argues that the credibility determination by the ALJ is not entitled to due weight because it was not thoroughly explained. (ECF No. 37 at 14 n.4.)

Even reviewing the testimony *de novo*, the Court finds that it is not entitled to substantial weight. The parent observed the classroom on two occasions and on one occasion noticed Student wandering around without being redirected. (AR 1861-62.) She did not testify to any behavioral issues that were severe, aggressive, or that could not be controlled through Student's IEP. Even if she had observed such behavior, one instance of concerning behavior would not necessarily indicate a behavioral problem rising to the level where behavioral intervention is required. *See A.G. v. Paso Robles Joint Unified Sch. Dist.*, 561 F. App'x 642, 644 n.4 (9th Cir. 2014) (a "single occurrence" of adverse behavior is not evidence of a pervasive behavior issue sufficient to trigger a behavioral intervention). Furthermore, the parent admitted that she was dissatisfied with the District, which may have colored her assessment of what she observed in the classroom. (AR 1876-79.)

## 2. October 17, 2014 IEP Meeting

On October 17, 2014, following Student's seizure disorder diagnosis and a behavioral incident at school, Student's IEP team met to discuss Student's recent behavior. (AR 514-18.) The team also discussed Student's medical needs, as Student had recently been diagnosed with a seizure disorder following a grand mal epileptic seizure on August 24, 2014. (AR 515.) Student contends that the IEP team denied Student a FAPE by not completing an FBA immediately following the incident which included "hitting and kicking." (ECF No. 37 at 14.) In support of his argument, Student cites a report by his expert witness, Dr. Hayden. (AR 434.)

The District's failure to complete an FBA immediately following the incident did not deny Student a FAPE for several reasons. First, the District acted in accordance with applicable laws and regulations by discussing and developing strategies, goals, and behavioral supports to address Student's behavioral issues. (AR 516-17.) The IEP team discussed and agreed to implement the following strategies, among others: (i) add an adult aide to the classroom to work one-on-one with Student, (ii) use positive reinforcement to affirm Student's good behavior (such as Legos, puzzle pieces), (iii) arrange for an aide to meet Student when he arrives at school in the morning to reinforce behavior and prime him for the day, (iv) use of timers and cues for transitions, (v) use of visual tokens and supports, and (vi) elimination of triggering locations, such as the cafeteria, from Student's schedule. (*Id.*) There was no law or regulation in place after July 1, 2014 that required the District to complete an FBA specifically in response to Student's behaviors. The District was required to "consider the use of positive behavior interventions and supports, and other strategies, to address that behavior." 34 C.F.R. § 300.324(a)(2)(i); Cal Educ. Code § 56341.1(b)(1). Indeed, the U.S. Department of Education explicitly declined to implement a requirement that behavioral supports and interventions be based on an FBA, noting that their regulation focuses on "interventions and strategies, not assessments." 71 Fed. Reg. 46,540, 46, 687 (2006). The record demonstrates that the District, in consultation with Parent, took appropriate steps to

address their concerns about Student's behavior.[9] Dr. Hayden's conclusion that Student's attention-seeking behavior "should have triggered a Functional Behavioral Assessment," (AR 434), is not supported by law and contradicts U.S Department of Education guidance. The District did not deny Student a FAPE by declining to offer or complete an FBA at the October 17, 2014 IEP meeting.

### 3. October 29, 2014 IEP Team Manifestation Determination Meeting

Following another behavior incident on October 22, 2014 during which Student grabbed a student around the throat and hit another student on the side of the head, the IEP team held a manifestation determination meeting to discuss next steps on October 29, 2014. (AR 661; AR 525-27.) The team discussed a variety of other strategies for addressing Student's behavior. (AR 525-26.) The team also discussed the fact that Student's seizure medication might be causing some of his aggressive and violent behaviors. (AR 525.) At the meeting, the team agreed to run several assessments on Student, including two FBAs (for aggressive behavior and eloping). (AR 527.)

### 4. Timing of FBA

Student contends that the FBAs, completed February 6, 2015 (aggressive behavior) and March 6, 2015 (eloping), could have and should have been completed within sixty days of the October 29, 2014 IEP team meeting.

#### a. Legal Requirements

An evaluation under IDEA must be completed within sixty days of receiving parental consent. 20 U.S.C. § 1414(a)(1)(C)(i)(I); Cal. Ed. Code § 56344. A reevaulation "shall occur . . . not more frequently than once a year, unless the parent and the local educational agency agree otherwise." § 1414(a)(2). California Education Code § 56344(a) gives school districts sixty days to complete mandatory assessments and to hold a meeting with the parents to discuss the results. *See Lazerson v.*

---

[9] The record further demonstrates that the IEP team, including parent, discussed whether an FBA would be appropriate at the October 17, 2014 meeting, but decided to consider other supports and interventions first. (AR 517.) The team agreed that if Student's concerning behavior continued, an FBA might be warranted in the future. (*Id.*)

*Capistrano Unified Sch. Dist.*, No. SACV 09-958 DOC ANX, 2011 WL 1212155, at *6 (C.D. Cal. Mar. 25, 2011). However, the FBA was not an "evaluation," "reevaluation" or a "mandatory assessment" under federal or California law at the time. *See* 34 C.F.R. § 300.324(a)(2)(i); Cal. Educ. Code § 56341.1(b)(1); 71 Fed. Reg.at 46,678. Student had already been evaluated under IDEA and found to be eligible. (AR 245.) Therefore, the proposed FBAs did not fall under the category of an initial evaluation under 20 U.S.C. § 1414(a)(1) or California Education Code § 56344. The FBA was not conducted as part of a reevaluation process either, as Student had been reevaluated less than a year before the IEP team agreed to conduct the FBAs. 20 U.S. C. § 1414(a)(2). The FBAs were instead an assessment: the "screening of a student by a teacher or specialist to determine appropriate instructional strategies for curriculum implementation." 34 C.F.R. § 300.302 (describing the difference between assessments and evaluations under the law); *see also W.-Linn Wilsonville Sch. Dist. v. Student*, No. 3:12-CV-02364-ST, 2014 WL 3778571, at *22-23 (D. Or. July 30, 2014) (concluding that "an FBA may not be considered an evaluation or reevaluation" because it "administered for the limited purpose of adapting teaching strategies to a child's behavior, as opposed to determining eligibility or changes in placement"). Student has not explained why the sixty day timeline applies to the District's offer to conduct FBAs, and the regulations do not set specific timelines for school districts to complete other types of assessments.

Instead, the Court will evaluate whether the District appropriately "consider[ed] the use of positive behavior interventions and supports, and other strategies," including conducting the agreed upon FBAs, in responding to Student's behavior from the time that the District and Parent agreed to conduct the FBAs on October 29, 2014 until the FBAs were completed and discussed at the March 12, 2015 IEP meeting. 34 C.F.R. § 300.324(a)(2)(i); Cal. Educ. Code § 56341.1(b)(1).

### b.  Absence and Home Hospital

Student was out of school for illness and home hospital from October 23, 2014 until January 6, 2015. (AR 659.) During the hearing, Student's expert witness, Dr. Hayden, testified that it would have

been appropriate to conduct the FBAs in the home setting. (AR 2172-74.) However, he also conceded that the demands of the home and school environment are different and can affect the function of behavior. (AR 2172-74.) District school psychologist Sharon Owen disagreed with Dr. Hayden's conclusion,[10] offering her opinion that it would have been inappropriate to conduct an FBA in the home setting. Ms. Owen testified that the purpose of the FBAs was to measure and to observe Student's behavior in an educational environment and come up with strategies and supports for addressing that behavior. (AR 1467-68.) Therefore, conducting the assessment at the home would not have served that purpose and would have violated the requirements of 34 C.F.R. § 300.304(c)(7), which provides that an assessment must be capable of providing "relevant information that directly assists persons in determining the educational needs of the child." Conducting the assessment outside of school would not have provided data on Student's behavior in the educational environment, and therefore it would not have helped to address that behavior. Ms. Owens also indicated that it would be inappropriate to conduct a behavior assessment in the home setting because the psychologist needed to be able to observe Student without him being aware that he was being observed, which would not be possible in the home. (*Id.*) Ms. Owens indicated that otherwise, the assessment would be tainted by "Hawthorne effect": the phenomenon that subjects who are being observed by someone they know tend to act differently. (*Id.*) The District did not violate federal or state requirements that they consider positive behavioral interventions by failing to conduct an FBA during this period.

### c. **Early 2015 Delay**

Student further contends that delay in the beginning of 2015 was inexcusable. Student points out that during this period, Student's behavior worsened and he was spending significant time outside the classroom – as much as 70% of the school day. (ECF No. 37 at 15, 16 (citing AR 1683).) Nonetheless,

---

[10] Student represents that Ms. Roach testified that data for an FBA could be taken in the home setting. (ECF No. 37 at 17 (citing AR 1683).) This statement mischaracterizes Ms. Roach's testimony. Ms. Roach testified that there is benefit to reinforcing behavior at home. (AR 1682-83.) However, she indicated that it would have been inappropriate to conduct an FBA in the home setting under the circumstances. (AR 1623-24 ("The Functional Behavioral Assessment needs to be done in a school environment for school behavior").)

the District had flexibility and discretion in administering the FBAs. Their determination that the FBA should be delayed to allow Student to re-adjust to school and establish a behavioral baseline after a prolonged absence was sound. *B.D. v. Puyallup Sch. Dist.*, No. C09-5020RJB, 2009 WL 2971753, at *18-19 (W.D. Wash. Sept. 10, 2009) (delay in implementing FBA and BIP due to parents' request that school district re-write student's entire IEP did not support claim for denial of a FAPE), *aff'd*, 456 F. App'x 644 (9th Cir. 2011); *Clark ex rel. J.J. v. Special Sch. Dist. of St. Louis Cty.*, No. 4:10CV2128SNLJ, 2012 WL 592423, at *12-13 (E.D. Mo. Feb. 23, 2012) (delay in formalizing and implementing behavior strategies did not violate law where student's parent removed him from school during part of the relevant period). The reasoning for the delay was explained to the Parent on the waiver form. (AR 555.) Parent waived the default timeline in writing.[11]

The record demonstrates that at all times during the 2014-2015 school year while Student was actively attending school in the District, the IEP team responded promptly to behavior incidents, communicated promptly with Parent, and considered a wide variety of behavioral supports and interventions, including FBAs. Their consideration of these supports and interventions was in accordance with applicable laws and regulations. 34 C.F.R. § 300.324(a)(2)(i); Cal. Educ. Code § 56341.1(b)(1). The ALJ did not err in determining that Student was not denied a FAPE due to the delay in administering the FBAs.

---

[11] Parent testified that the school withheld information about Student's negative behavior from her and that she would not have consented to the delay if she had been aware of the extent of Student's behavioral problems in the beginning of 2015. (AR 2268-69; AR 2276-77.) The ALJ gave minimal weight to the testimony, concluding that the record indicated that Student's father had been informed of Student's reported behaviors. (AR 740.) The ALJ further noted that Parent's testimony "did not refute . . . Ms. Roach's, and Ms. Owen's credible testimony regarding the reasons why they wanted to start the assessments in early February." (AR 754.) Student argues that the ALJ dismissed this testimony in an "absurdly irrational" way by finding that Parent's testimony that she would have withheld consent did nothing to undermine the District's good reasons for recommending the delay. (ECF No. 37 at 18.) Reviewing the testimony *de novo*, the Court concludes that Parent's assertion that she would have withheld consent for the FBA timeline waiver had she been aware of the extent of Student's behavioral issues is not material. Under the existing regulations, the District was not required to complete the FBAs within a certain timeframe. Therefore, the timeline waiver signed by Parent has no legal significance in determining whether the delay was appropriate. *Lazerson*, 2011 WL 1212155, at *6. Moreover, Parent's contention that she was not aware of the behavioral issues with Student at the time she signed the waiver is not credible in light of other evidence in the record. The record shows that Parent was informed that Student was having behavioral issues at lengthy IEP team meetings on October 17, 2014, October 29, 2014, and March 12, 2015. She was also aware that Student was suspended from school on September 30, 2014, October 9-10, 2014, October 16-17, 2014, October 22-23, 2014, and January 23, 2015. (AR 661; AR 2266.)

C. **Administration of Behavioral Assessments**

Student argues that the FBAs conducted by the District were inappropriate. Student contends that the testimony shows that at the time of the March 12, 2015 IEP, Student's behavior had not improved and that the supports suggested through the assessments were not effective. (ECF No. 37 at 19-20.) Student also alleges that Ms. Owen's testimony confirmed that Ms. Roach's assessments were deficient. (*Id.*)

Student did not produce any evidence to suggest that the FBAs conducted by Ms. Roach were deficient, nor does he dispute that he did not produce evidence to show that the FBAs were not conducted appropriately. (ECF No. 37 at 19-20.) Student's own expert witness, Dr. Hayden, did not testify that they were not conducted according to the proper procedures. Rather, Student asserts that District witnesses testified that the FBAs were not appropriate. (*Id.*)

Student's assertion that Ms. Owen believed that the FBAs were deficient mischaracterizes her testimony. Ms. Owen testified that she believed that Student was emotionally disturbed rather than autistic and therefore she did not believe that certain autistic behavior interventions suggested by the FBA would be effective. Although Student's diagnosis was discussed in the administrative proceedings, it is not a question in this appeal. (AR 743 & n.9.) The testimony cited by Student in support of his claim that Ms. Owen discredited the FBAs conducted by Ms. Roach actually refers to Ms. Owen's criticisms of Student's diagnosis at the time – a factor which is not at issue in this litigation. (*See* AR 1500-10.) Ms. Owen testified that the FBAs were accurate (AR 1498:18-1499:3), contrary to Student's assertion, (ECF No. 37 at 22).

Furthermore, the fact that the behavioral supports and interventions recommended in the FBAs were not effective in treating Student's behaviors does not necessarily indicate that the FBAs were inappropriate when made or procedurally deficient. *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999) (reviewing court evaluates an IEP for objective reasonableness in light of information available at the time it was drafted); *H.D. ex rel. A.S. v. Central Bucks School Dist.*, 902 F. Supp. 2d 614, 627 (E.D.

Pa. 2012) (finding that FBA was not inappropriate; the court noted that "[a]lthough some of the behavioral interventions based on this FBA succeeded while others did not, there is nothing in the record to suggest the FBA is flawed").[12] In assessing whether the FBAs were conducted appropriately, the ALJ considered the testimony of school psychologist Ms. Roach, who conducted the assessments, and school psychologist Ms. Owen. The ALJ noted that Ms. Roach was qualified to administer the two FBAs based on her credentials, and that she gathered and analyzed the relevant "functional, developmental, and academic information, including information provided by the parent, history and records review, and observations of Student." (AR 754.) The ALJ's conclusions on this point are thorough and well-reasoned despite the limited evidence presented by the parties regarding the appropriateness of the assessments. Therefore, the Court agrees that Student has not met his burden of demonstrating that the FBAs were not appropriate and therefore denied him a FAPE.

## VIII. CONCLUSION AND ORDER

For the foregoing reasons, the Administrative Decision is AFFIRMED.

IT IS SO ORDERED.

Dated:   **April 12, 2017**          **/s/ Lawrence J. O'Neill**
                                 UNITED STATES CHIEF DISTRICT JUDGE

---

[12] Indeed, the record indicates that the District only had two school days in which to work to implement those interventions before Parent pulled Student from school. (AR 1498:18-1499:3.) Therefore, Student's contention that the interventions proposed by the FBAs were ineffective seems to be based on limited application.